```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                           MIAMI DIVISION
                    CASE NO.  21-CR-20151-RKA


UNITED STATES OF AMERICA,

                 Plaintiff,

       vs.

                                      Miami, Florida
                                      June 4, 2021
ENDY DE JESUS NUNEZ MARMOL,           Pages 1-47

                 Defendant.
_____

             TRANSCRIPT OF PRETRIAL DETENTION HEARING
              CONDUCTED VIA ZOOM VIDEOCONFERENCING
          BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE PLAINTIFF:
                     United States Attorney's Office
                     BY:  RICHARD R. GETCHELL, JR., A.U.S.A.
                     11200 Northwest 20th Street
                     Miami, Florida 33172


FOR THE DEFENDANT:
                     Jose M. Quinon, P.A.
                     BY:  JOSE M. QUINON, ESQ.
                     2333 Brickell Avenue
                     Suite A-1
                     Miami, Florida 33129



TRANSCRIBED BY:      DAWN M. SAVINO, R.P.R., C.R.R.
                     Official Federal Court Stenographer
                     400 N. Miami Avenue, 10S03
                     Miami, Florida  33128
                     Telephone:  305-523-5598
```

PROCEEDINGS RECORDED BY COURTROOM DIGITAL AUDIO RECORDER
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

```
1                        P-R-O-C-E-E-D-I-N-G-S
2              COURTROOM DEPUTY:  United States of America versus Endy
3       Nunez-Marmol, case number 21-20151-criminal-Altman.
4              Counsel, please state your appearances for the record.
5              MR. GETCHELL:  Good morning, Your Honor.  Assistant
6       United States Attorney Richard Getchell on behalf of the United
7       States.
8              MR. QUINON:  Good morning, Your Honor.  Jose Quinon on
9       behalf of Endy Nunez-Marmol.
10             THE COURT:  All right.  We're here for detention
11      hearing?
12             MR. QUINON:  Yes.
13             THE COURT:  Is the government ready to proceed.
14             MR. GETCHELL:  Yes, Your Honor.  I anticipate the
15      answer to this is going to be in the negative, but the two
16      defendants on Page 10 and 11 are co-defendants in the same case,
17      and the government's presentation will be identical as to the
18      two of them.  Is there any possibility for them both to be in on
19      this same hearing at the same time?  Within the FDC
20      restrictions?
21             THE COURT:  No.  That's one of the inconveniences.  I
22      have had some where I have as many as three or four defendants
23      and had to do the whole thing over and over again.
24             MR. GETCHELL:  All right.  Understood, Your Honor.  I
25      just thought that it's a good idea to ask.
```

1          THE COURT:  I don't think that FDC would allow both of

2     them to be in the same room together.

3          THE COURT:  All right, Your Honor.

4          Well, the United States is proceeding with a request

5     for pretrial detention based on risk of flight and danger to the

6     community.  On the indictment that has been returned in this

7     court -- I'm trying to pull up my notes here, I will -- the

8     government will proceed by proffer, although Task Force Officer

9     Marcelino Mariabello is also on this hearing and is available

10    for cross-examination by the defense, if they so desire it.

11         This case involves charges of conspiracy to distribute

12    five kilograms or more of cocaine intending, knowing, and having

13    reasonable cause to believe it would be imported into the United

14    States; conspiracy to import cocaine and conspiracy to possess

15    with intent to distribute cocaine.  Because the case involves a

16    significant amount of cocaine, well in excess of five kilograms,

17    the statutory minimum is ten years imprisonment up to a maximum

18    of life imprisonment, therefore the presumption under Section

19    3142 that the Defendant poses a risk of flight and danger to the

20    community do apply in this case.

21         Your Honor, the case involves a multi-year conspiracy

22    to traffic cocaine from the Dominican Republic to Miami and

23    elsewhere in the US, including New York and Pennsylvania.  The

24    primary concealment method for the cocaine was to flatten blocks

25    of cocaine in such a way that the cocaine could be sandwiched

1    between cardboard panels that were a part of the flaps of boxes

2    containing cover loads of legitimate cargo, most often fruit.

3    Each of these boxes would contain approximately one kilogram of

4    cocaine, and each shipment would consist of 100 or more boxes.

5    One series of shipments were 250 kilos at a time.

6           The cocaine would be shipped to South Florida where it

7    was received by Miami-based traffickers, divided and distributed

8    locally.

9           The Defendants in this case received their share of

10   cocaine from the shipments in Miami, then transported the

11   cocaine to the northeast where the cocaine was sold.  As well

12   Your Honor, some of the shipments were sent directly New York,

13   the New York area and distributed there.

14          In addition to shipments by containerized cargo, a

15   second route was established by this network where the cocaine

16   was imported into South Florida hidden aboard private yachts.

17   Cocaine was also shipped to Puerto Rico by the same drug

18   trafficking organization.

19          This Defendant and his brother are based in the

20   Dominican Republic, and their role in the conspiracy was to

21   receive and distribute the cocaine in the New York area

22   according to witnesses who were familiar with the conspiracy and

23   involved in the conspiracy.  The cocaine the brothers sell is

24   the cocaine -- cocaine that is in flat packages, not kilo

25   bricks, which is the more traditional packaging method.

1      According to witnesses, witnesses say the brothers own

2  businesses in New York and property in the Dominican Republic as

3  well as businesses, and they are known to ship cocaine to the US

4  in containerized cargo.  The brothers bought cocaine in the

5  D.R., to -- that's Dominican Republic, I'm sorry, to include

6  cocaine shipments to the United States and as noted, cocaine was

7  imported into South Florida and New York.

8      And the area of cargo shipments, although most of the

9  cocaine shipments that the Defendants shipped with their

10 co-conspirators were successful, one such shipment was seized by

11 law enforcement from a van in South Florida on March 26, 2015.

12 The cocaine was concealed in a secret compartment in the van.

13 At that time, additional kilos from the same shipment were

14 seized from a stash house in the Kendall Florida area.  This

15 shipment was tied to the Defendant's codefendant, Miguel Andres

16 Gutierrez.

17     In approximately 2013 or 2014, this organization sent

18 seven or eight shipments of cocaine from Dominican Republic to

19 Miami concealed in these cardboard boxes.  Each load consisted

20 of 250 kilos of cocaine.  The cocaine was packed in the boxes in

21 the Dominican Republic by a co-conspirator, or multiple

22 co-conspirators, and shipped by a container to Miami.  As noted,

23 each box contained one kilo of cocaine.  A codefendant, Miguel

24 Andres Gutierrez and his brother, Miguel Emilio, devised the

25 method of concealing the cocaine in cardboard box flaps in the

6

1    Dominican Republic.  During the course of the conspiracy, one of

2    the Miami-based traffickers who was involved in some of these

3    loads actually traveled to the Dominican Republic to be trained

4    at the site where these packages were created on the method that

5    would need to be used to remove the cocaine from the cardboard

6    box flaps.

7         Once the cocaine arrived in Miami, it was sold to the

8    Nunez brothers, including this Defendant, Endy Nunez, and his

9    brother Danny, who were associates of Miguel Andres Gutierrez,

10   and whose function was as noted, to receive and distribute

11   cocaine in the United States.  Endy Nunez was the leader among

12   the brothers.

13        The cocaine was transported to New York by a cousin of

14   the Defendants who was involved in law enforcement.

15        In 2016, approximately, Endy Nunez began working

16   directly with codefendant Miguel Gutierrez and in 2017, they

17   (unintelligible) a load of 200 kilos together that was packed in

18   boxes and delivered to the brothers here in the US.  Cocaine was

19   imported inside a containerized shipment of fruit and the

20   cocaine was sold by the Nunez brothers in New York.  Proceeds

21   were collected and sent to the Dominican Republic.  The

22   conspiracy successfully imported at least four more loads of

23   cocaine between 2017 and 2019 using this method.

24        At some point during the conspiracy, Miguel Gutierrez

25   introduced Endy Nunez to a known Miami drug trafficker who had

1    connections at Port Everglades where this trafficker could

2    import cocaine via containerized cargo.  Endy Nunez and this

3    individual then began working together shipping loads with, at

4    that time, Miguel Gutierrez getting a cut of the profits from

5    each kilo shipped, but not participating directly in those

6    shipments.

7              In September of 2017, a shipment of approximately 150

8    kilos of cocaine hidden in boxes was imported into Port

9    Everglades.  This cocaine was sourced by Miguel Gutierrez,

10   that's Miguel Andres Gutierrez, and the shipment was owned by a

11   produce company, Doral Florida, which had been acquired by

12   Gutierrez specifically to use as a cover to import cocaine from

13   the Dominican Republic.  This load was seized at the port on

14   September 22, 2017 and consisted of approximately 167 kilograms

15   hidden in the flaps of cardboard boxes.

16             In addition to the containerized cargo, as I mentioned,

17   the organization shipped cocaine via private yachts.  The first

18   such shipment known to law enforcement is -- occurred in

19   approximately 2014 onboard a boat called the *Emma Grace*.  A van

20   with 229 kilos was delivered to Danny Nunez, the Defendant's

21   brother, in Kendall, Florida, at which point Endy Nunez and his

22   cousin in law enforcement traveled to Florida to transport the

23   cocaine to New York for sale and distribution.  After that

24   cocaine was sold, Endy Nunez delivered approximately $5 million

25   in drug proceeds to another trafficker in Kendall, Florida.

1    According to individuals involved in the organization

2  at that time, the Nunez brothers moved millions of dollars in

3  drug proceeds through a residence in Miramar, Florida which is

4  thought to be the residence listed by Endy Nunez as his

5  residence where he would stay if he were released on bond in

6  this case, and also this address was listed on Danny Nunez's

7  driver license.

8    Your Honor, in May 2015, a second load of 380 kilograms

9  of cocaine was imported aboard a boat called *Happy Ending*.  A

10  portion of this cocaine was delivered to Endy and Danny Nunez in

11  Kendall.  The cocaine was transported to New York by the cousin

12  and sold to the distributors at --

13    THE COURT:  One moment.  Stop, Mr. Getchell.  We lost

14  them.

15    MR. GETCHELL:  Did we lose the jail?

16    IT TECHNICIAN:  Yes, we lost FDC.

17    COURTROOM DEPUTY:  Is the marshal calling?

18    US MARSHAL:  I already notified them, Your Honor.

19    THE COURT:  Thank you.

20    SPANISH INTERPRETER:  He is connected through the

21  interpreter, Your Honor.

22    THE COURT:  All right.  Mr. Getchell, pick up where you

23  left off a little bit before just so we get some continuity.

24    MR. GETCHELL:  Yes, Your Honor.  I'll rewind a little

25  bit.

1          As I noted in May of 2015, a second load of 380

2     kilograms of cocaine was imported aboard another boat called the

3     *Happy Ending*.  A portion of this cocaine was delivered to Endy

4     and Danny Nunez in Kendall, and then transported to New York by

5     their cousin and sold in that area.  The drug proceeds from the

6     sale of the cocaine were delivered by the brothers in Miami,

7     Florida, before being sent by other individuals back to the

8     Dominican Republic.

9          In approximately 2016, the co-Defendant Miguel Andres

10    Gutierrez, provided a million dollars in cash to finance the

11    purchase of 120 kilos of cocaine in the Dominican Republic.

12    This cocaine was part of a shipment of 430 kilos shipped in

13    April 2016 aboard the *Happy Ending* from the Dominican Republic

14    to Fort Lauderdale.  Gutierrez's share of the cocaine was

15    delivered to Endy and Danny Nunez outside the same restaurant

16    where they had met the Miami traffickers on prior occasions.

17    This cocaine was delivered in a vehicle supplied by the Nunez

18    brothers for the purpose of transporting the cocaine.  Proceeds

19    from the sale of this cocaine when collected were paid by the

20    Nunez brothers directly to co-defendant Miguel Andres Gutierrez.

21         In June or July of 2016, this organization imported

22    another 410 kilos of cocaine through the same marina in Fort

23    Lauderdale.  Approximately 150 kilos were delivered to Endy and

24    Danny Nunez outside a Walgreens in Kendall, Florida.  The

25    cocaine was transported to New York by the Nunezes and their

1    cousin.  $3 million of drug proceeds were delivered by the Nunez

2    to Miami traffickers, approximately two weeks after the cocaine

3    was delivered to the Nunez brothers in Kendall.

4           In approximately August of 2016, another 410 kilo

5    shipment was imported aboard the same yacht.  150 kilos again

6    were delivered by the Miami traffickers to Endy and Danny Nunez.

7    Proceeds of 2 to $3 million were delivered in New York to a

8    representative of the Miami traffickers.  Approximately $450,000

9    collected from the sale of this load was seized by law

10   enforcement in August of 2016.

11          Endy and Danny Nunez collaborated with co-defendants

12   Miguel Andres and Miguel Emilio, as mentioned, to import several

13   loads of cocaine from the DR to the US concealed by box flaps.

14   I believe I already went over this.  Each load consisting of

15   approximately 250 kilos with the Nunez brothers investing in 125

16   kilos and the Gutierrez brothers investing in 125 kilos in each

17   load for a total of 250.

18          The last shipment that the brothers did together, the

19   two sets of brothers did together, was in late 2019 or early

20   2020 and again, fruit was used as the cover load for these

21   shipments which were shipped to -- those particular shipments to

22   New York via containerized cargo.

23          Your Honor, in terms of dangerousness that the brothers

24   present, including Endy Nunez here, present a danger to the

25   community by virtue of the large amount of drugs they've

 1    trafficked into the United States.  Hundreds of kilos of cocaine
 2    over the course of several years.  As well, they had been
 3    considered by other individuals familiar with them as having a
 4    reputation for violence in connection with drug trafficking.
 5    Although I would note for the record that I do not have any
 6    specific instances where they've committed any acts of violence,
 7    except something I'll mention in a moment, but this is just
 8    their general reputation.
 9              Sometime in 2017, according to witnesses, one of their
10    associates offered to pay Endy Nunez-Marmol to kill a drug
11    trafficking associate called Caballo who was a Colombian
12    supplier of cocaine who, at one point I believe, was arrested in
13    connection with the seizure of cocaine here in South Florida.
14    Caballo had made threats against the Nunez's associate who was
15    in fear of Caballo and wanted him to be taken care of, so to
16    speak.  Endy Nunez agreed to help and take care of the problem
17    as the witness relates.  According to the witness, it was the
18    same cousin of Endy Nunez who was helping to locate Caballo in
19    the Dominican Republic during that time.  And again, Your Honor,
20    according to multiple witnesses, the Defendant has a reputation
21    for violence and is known to have firearms, including
22    semiautomatic rifles in the Dominican Republic.
23              Other factors for consideration, Your Honor, are the
24    notes in the Pretrial Service Report which indicate that the
25    Nunez brothers own businesses in Dominican Republic, including a

1   lounge and a car rental company.  Endy Nunez is also reputed to

2   own businesses in the New York area and to buy and sell cars as

3   a way to launder drug money.  Endy Nunez also owns and operates

4   businesses in -- the same businesses in the DR.

5         The two Nunezes have very strong ties, family ties in

6   the Dominican Republic, and have a family home there at, I

7   believe, it's La Presa Sabaneta Iglesias, where they have met

8   with other drug traffickers to conduct drug business.

9         Also as noted in the Pretrial Services report, the

10  Nunez brothers frequently travel back and forth between the

11  United States and the Dominican Republic dating back several

12  years.  They frequently fly both from the Miami and Fort

13  Lauderdale airports to the Dominican Republic, and also from the

14  New York area from JFK Airport, they also travel frequently

15  between Miami and JFK to conduct businesses and -- business and

16  so forth.

17        Although the United States recognizes that the

18  Defendants did surrender in the Dominican Republic voluntarily

19  returning to the United States to face these charges, it's our

20  contention that their strong ties in the Dominican Republic and

21  the nature of the offenses here and their role in the offenses

22  indicates that there's no bond that would reasonably assure the

23  Defendant's re-appearance in court, or to ensure the safety of

24  the community if they were to be released.

25        THE COURT:  All right, Mr. Getchell.  So you're

1   traveling under both risk and danger?

2           MR. GETCHELL:  Yes, Your Honor.

3           THE COURT:  And for risk you're relying on the ties

4   with the DR?

5           MR. GETCHELL:  Yes, Your Honor.

6           THE COURT:  And on danger, on the amount of drugs and

7   then the other stuff about Mr. Endy, this person, this witness

8   who said about taking care of somebody.

9           Do you have accumulative -- I know the charge on the

10  indictment is five kilograms or more, but I also note that

11  there's the penalty sheet that says life in prison.  Do you have

12  an accumulated total of the drug shipments that were 150 here,

13  125 there and so on, do you have any calculation?

14          MR. GETCHELL:  Your Honor, I don't have the total

15  amount of -- the total estimated amount of cocaine.  I believe

16  that the amounts I stated add up to at least 2000 kilos, and in

17  any event would be well in excess of 450 kilos which would

18  trigger an offense level of 38, which is the highest under the

19  guidelines.

20          THE COURT:  So you think they add up to 2000, but at a

21  minimum they add up to 450 which triggers the highest level,

22  which triggers the life imprisonment calculation under the

23  guidelines.  Is that correct?

24          MR. GETCHELL:  Yes, Your Honor.

25          THE COURT:  Okay.  All right.  Okay.  So let's see.

1    You have Agent Mariabello.  Does Mr. Quinon want to question

2    him?

3           MR. QUINON:  Yes, Your Honor.

4           THE COURT:  All right.  Let's go ahead.  Stephanie,

5    swear him.

6           COURTROOM DEPUTY:  Okay, Judge.  Raise your right hand.

7    Do you solemnly swear to tell the truth, the whole truth and

8    nothing but the truth so help you God?

9           THE WITNESS:  I do.

10          COURTROOM DEPUTY:  Please state your full name for the

11   record and spell your last name.

12          THE WITNESS:  Marcelino Mariabello.  Last name spelled

13   M-A-R-I-A, B as in boy, E-L-L-O.

14          COURTROOM DEPUTY:  Thank you.

15                          CROSS-EXAMINATION

16   BY MR. QUINON:

17   Q.  Good morning, sir.

18   A.  Good morning.

19   Q.  Okay, now, you're the lead agent in this case?

20   A.  I am.

21   Q.  Okay.  When did you begin working on the case?

22   A.  Approximately 2016, 2017.

23   Q.  Okay.  And you are a DEA agent?

24   A.  I am a task force officer assigned to the DEA.

25   Q.  In what department are you employed by?

1    A.  City of Sunny Isles Beach.

2    Q.  How long have you been employed with the city of Sunny

3    Isles?

4    A.  Since February 2008.

5    Q.  And before -- what year did you join the task force?

6    A.  Approximately 2017.

7    Q.  And in what capacity were you working with the city of Sunny

8    Isles right before you joined the task force?

9    A.  Detective section, narcotics division.

10   Q.  Okay.  Now, are you -- you work with the task force that is

11   based here in South Florida, correct?

12   A.  Yes, sir.

13   Q.  So you're not based in the Dominican Republic, are you?

14   A.  I am not.

15   Q.  Okay.  Now, there's been a proffer by the prosecutor in this

16   case, Mr. Getchell, and you had an opportunity to hear that,

17   correct?

18   A.  Yes.

19   Q.  All right.  Now, I want to basically ask a question to

20   distill the evidence that goes to my client, Endy Nunez

21   particularly.

22        So my question to you is, I'm going to ask you

23   questions about the type of evidence that you have.  What type

24   of evidence do you have against Mr. Nunez at this point, Endy

25   Nunez?

1    A.   We have statements from cooperating defendants.   We have

2    corroborating evidence in seizures.   Subsequent sister

3    investigations attached to this drug trafficking organization.

4    We have travel records confirming travel in which loads were

5    dispatched either from the Dominican Republic here in Miami to

6    New York.

7    Q.   All right.   Let me get into that for a second.   Would I be

8    correct in saying that the primary type of evidence that you

9    have in this case would be informant testimony?

10   A.   Yes.

11   Q.   All right.   And so for example, there are no wiretaps in

12   this case that you can say Mr. Nunez was recorded, correct?

13   A.   No.

14   Q.   All right.   There are no recordings as to Endy Nunez as

15   well, correct?

16   A.   No.

17   Q.   All right.   And there are no videos where we would see Endy

18   Nunez as well, correct?

19   A.   There are no videos, no.

20   Q.   All right.   And in all the shipments of cocaine, and

21   Mister -- Assistant US Attorney Getchell just went over a number

22   of shipments, were there any fingerprints that were retrieved by

23   the law enforcement people?

24   A.   There were not, no.

25   Q.   So we don't have any fingerprints that relate to Endy Nunez,

1  correct?

2  A.  No, sir.

3  Q.  All right.  We don't have, as we have in other cases,

4  e-mails or texts relating to Endy Nunez that he is involved in,

5  correct?

6  A.  That he is the author of?  No.

7  Q.  All right.  Now, you mentioned that there were some seizures

8  that would corroborate the case against Endy Nunez did you say?

9  A.  In this case Endy and Danny Nunez, yes sir.

10  Q.  All right.  But other than showing the cocaine came into the

11  United States, what is the evidence in those seizures,

12  documentary evidence or fingerprint evidence, physical evidence,

13  directly tie to Endy Nunez?  Can you tell that for me?

14  A.  Well, it would reference back to the co-defendants and their

15  proffer statements.

16  Q.  Right.  So bottom line is there is no corroborating physical

17  evidence, it all relies upon the word of individuals who are

18  informants who are cooperating in the case, correct?

19  A.  Yes, sir.

20  Q.  All right.  And by the way, these individuals that you

21  referenced that are cooperating, they are trying to reduce their

22  sentences?  Is that the nature of their cooperation?

23  A.  In most instances, yes.

24  Q.  Okay.  And when you say in most instances, what are the

25  other instances?  Are there other individuals who are

1   cooperating because they are getting paid and not because

2   they're getting their sentences reduced?  Is that what you're

3   saying?

4   A.   That is another instance.  There's other factors as well.

5   People that volunteer information but do not want to come public

6   with it because of fear of retribution.

7   Q.   All right.  Now, as to Endy Nunez -- and we heard a lot of

8   references about the Gutierrezes, Miguel Gutierrez and Miguel

9   Andres and another Gutierrez now, but I'm asking you questions

10   about this Endy Nunez.

11   A.   Yes, sir.

12   Q.   How many of the individuals that are making the statements,

13   how many have given information as to Endy Nunez?

14   A.   Every one of them.

15   Q.   One, right?

16   A.   No, all of them.

17   Q.   Okay.  How many is that?

18   A.   In excess of four.  Four or five individuals.

19   Q.   Well, you have been the lead since what year?  When did you

20   take over the case and become the lead agent?

21   A.   End of 2017, '18.

22   Q.   Okay.  And so you're not sure whether it's four or five?

23   A.   It's more like five individuals who directly gave

24   information in reference to Endy Nunez.

25   Q.   All right.  And again, I just want to be clear on this

1   issue:  There is no documentary evidence or physical evidence to

2   directly corroborate those individuals as to Endy Nunez,

3   correct?

4   A.  Yes, sir.  That is correct.

5   Q.  All right.  Now, those individuals, have they already

6   received the benefit of their cooperation or are they yet to

7   receive that benefit?

8   A.  Some have.

9   Q.  Okay.  And how many of them have not?

10   A.  Three.

11   Q.  Now, because you have been involved in this case since at

12   least 2017, and some of the shipments or some of the -- yeah,

13   some of the shipments that were mentioned by Mr. Getchell I

14   believe at least, according to what I believe I heard, some of

15   them occurred as late as 2019, all the information that you have

16   seems to be historical in nature, correct?  That seems to be the

17   core of your evidence, at least as to my client, Endy Nunez,

18   correct?

19   A.  That would be fair, yes.

20   Q.  All right.  Now, you've been involved since 2017.  Now, for

21   example, as to the shipments in 2019, why -- what's the reason

22   why no surveillance was placed upon the shipments that were

23   coming in?

24   A.  Those shipments that were coming in weren't investigated in

25   a proactive nature.  Those shipments came to light by just, you

1   know, seizures from other entities, defendant proffers and those

2   sort of investigative efforts, not directly trying to locate a

3   load that was inbound.

4   Q.   All right.  But I want to stay with that point just for a

5   second, okay?  2019, I believe Mr. Getchell mentioned the

6   shipment.  You had at least one, if not more, of those

7   individuals who were making statements now.  They were

8   cooperating prior to 2019, were they not?

9   A.   Prior to 2019?  No, sir.

10  Q.   No?  Okay.  When did the cooperation of those five

11  individuals begin?

12  A.   Pretty much towards the end of 2019, beginning of 2020.

13  Q.   Okay.  Now, Mr. Getchell mentioned that the cocaine came in

14  boxes, and most of the times came in boxes of fruit that were

15  imported here into the United States, and apparently inside of

16  that individual shipment of fruit apparently concealed somewhere

17  were cocaine that was packaged, correct?

18  A.   Yes.

19  Q.   All right.  Now, in order to import those shipments into the

20  United States, you have bill laidings (sic), you have invoices,

21  you have documents, you have a sender, you have a receiver, you

22  have a shipment company that does the freight.  I mean, you have

23  a number of individuals involved along the way, correct, for

24  those shipments.

25  A.   Yes.

1    Q.  All right.  And a lot of documents that go with it as well,

2    correct?

3    A.  Related to the shipment?  Yes.

4    Q.  All right.  And in none of those documents that are in all

5    the shipments that were mentioned by Mr. Getchell in his

6    proffer, in all that paperwork, not a single piece of paper

7    would tie back down to Endy Nunez, correct?

8    A.  No, sir.

9    Q.  That is correct.  Correct?

10   A.  That is correct.

11   Q.  All right.  And I would imagine that you-all, and by

12   you-all, of course I mean members of the task force and law

13   enforcement, tracked down the origination of the shipment, all

14   those people that were potentially involved, as well as tracked

15   down all the documents and you were doing -- that investigation

16   was done to try to identify people that were involved with each

17   shipment, correct?

18   A.  Yes.

19   Q.  Okay.  And again, Endy Nunez does not appear in any of the

20   documentation, correct?

21   A.  That is correct.

22   Q.  All right.  Let me go back to a question that I asked you

23   earlier.  You mentioned now that some of the cooperation began

24   to flow into law enforcement in 2019, beginning in 2020.  Any

25   shipments after the cooperation commenced by any of those five

1    individuals?  Did any shipments come in after that?

2    A.  That we partook in investigating and seized?  Ultimately

3    seized?  No.

4    Q.  Not that you ultimately seized, did you find out that there

5    were shipments coming in after at least one of those five

6    individuals was cooperating.

7    A.  Yes.  So we received some information about incoming and

8    pending dispatched loads.

9    Q.  All right.  Now, the questions that I asked you about, the

10   shipments and the documentation and all that, you all did the

11   research and investigation, did some of those shipments tie to

12   the Gutierrez brothers?

13   A.  Yes.

14   Q.  Did you find documentation that would tie them to those

15   shipments?

16   A.  Yes.

17   Q.  Okay.  And how about Mr. Getchell also made reference to the

18   yachts, I believe he mentioned two of them; is that correct?

19   Two yachts.

20   A.  Yes, sir.

21   Q.  All right.  I would imagine that part of the investigative

22   work that was done is to try to find out who was the owner, who

23   would be the users of those yachts, correct?

24   A.  Yes.

25   Q.  And we know that it didn't come back to my client Endy

1     Nunez, but my question is did you make -- as a result of those

2     investigations, were you able to tie them to the Gutierrez

3     brothers?

4     A.  Yes.

5     Q.  All right.  Now again, Mr. Getchell made reference to the

6     fact that at least as to one, possibly more of the shipments

7     when the cocaine was transported from Florida to New York, and I

8     believe he mentioned at least in his proffer one shipment where

9     the Nunez brothers had rented an automobile I believe was part

10    of what Mr. Getchell proffered.  Have you found any evidence at

11    all that either Endy or his brother Danny leased or rented any

12    automobile at that time for New York, to go to New York?

13            MR. GETCHELL:  Objection, Your Honor.  The proffer was

14    that the Nunez brothers provided a vehicle.

15            THE COURT:  All right.

16            MR. QUINON:  All right.  My mistake then, and I

17    apologize, Your Honor.  I then misunderstood it.  Okay.

18        BY MR. QUINON:

19    Q.  Have you been able to tie any automobile to Endy Nunez that

20    was used to transport cocaine to New York?

21    A.  No.

22    Q.  Again, on the issue of violence, Mr. Getchell proffered that

23    there was rumor I suppose, or gossip, however you want to phrase

24    it, that Endy was violent or could be violent.  I believe was

25    something to that effect was offered by Mr. Getchell.  But he

1    was very specific in saying that there were no specific

2    instances.  All these are we believe he is, but there are no

3    specific instances that you're aware of concerning Endy Nunez

4    about violence; is that correct?

5    A.  That is correct, yes.

6    Q.  And obviously there is no evidence for you to corroborate

7    violence because you have no evidence of specific instances,

8    correct?

9    A.  That is correct.

10   Q.  Now, I believe that Mr. Getchell in his proffer also

11   mentioned the -- my client, Endy Nunez, owns businesses in the

12   Dominican Republic, but I think he made reference, and I maybe

13   mistaken and I could be corrected, that Endy may own a business

14   in New York; is that right?  Are you aware of any business that

15   my client Endy Nunez owns in New York?

16   A.  So Mr. Endy Nunez has several businesses attributed to him,

17   one in which having been registered out of Miami, several of

18   which having been registered out of the Dominican Republic.  I

19   don't recall any specifically being out of New York.

20   Q.  Okay.  So you have -- the answer to the question is simple,

21   and I'm sorry to go back to it, but I asked you whether you have

22   any evidence that Endy Nunez owned a business in New York and

23   the answer is you don't; is that correct?

24   A.  Yes.

25   Q.  All right.

1   A.   That's correct.

2   Q.   Now, we know and we're very aware that he owns businesses in

3   the Dominican Republic, and I'll take that up later with the

4   judge, but New York no businesses.

5         Okay.   Now, you are aware, are you not, that -- let me

6   strike that.

7         MR. QUINON:   Judge, I'd just ask for just a minute,

8   just briefly to look at my notes.   I'm pretty much done, but I

9   just want to make sure that I --

10         THE COURT:   All right.

11         MR. QUINON:   Just a second.   I apologize to you.

12         THE COURT:   That's all right.

13         MR. QUINON:   And to everybody else.

14   BY MR. QUINON:

15   Q.   Okay.   Lastly, and then I'm pretty much done, you of course

16   are aware of the surrender of the Nunez brothers, correct?

17   A.   I am.

18   Q.   In fact, you're aware of that because I met with you and

19   Mr. Quintero, the other lawyer, we met with you here at the

20   Miami International Airport last week, last Thursday I believe,

21   when the Nunez brothers came in from the Dominican Republic; is

22   that correct?

23   A.   Yes.

24   Q.   All right.   Now, I dealt with other DEA agents and marshals

25   in the surrender, but you and I didn't speak.   I was speaking

1    mostly with another agent in your group; is that correct?

2    A.   Yes.   The group supervisor.

3    Q.   Okay.   And you were aware, were you not, during the days

4    that I was talking to the group supervisor to make arrangements

5    so that things could be organized and coordinated in the

6    Dominican Republic so that both brothers could surrender; were

7    you aware of that?

8    A.   Yes.

9    Q.   As things were going on.   Yes.   Okay.   And were you aware

10   the coordination that took place as well would be US Marshals

11   over in the Dominican Republic, that I arranged in order to

12   coordinate the surrender as things were going on.

13   A.   I was aware.

14   Q.   All right.   And they voluntarily surrendered.   They came in

15   and they surrendered.   And to your knowledge, there was no

16   pre-condition; in other words, I didn't, on their behalf, ask

17   would you agree to a bond before they come in, would you agree

18   to this, to that.   No pre-condition at all.   It was just they're

19   coming in, they want to come in and face the charges, we're

20   going to surrender them.   So far as you know, that is what took

21   place, correct?

22   A.   That is correct.

23   Q.   All right.

24            MR. QUINON:   That's all I have, Your Honor.

25            THE COURT:   All right.   Mr. Getchell, any follow-ups?

```
1              MR. GETCHELL:  A few questions Your Honor.
2                         REDIRECT EXAMINATION
3         BY MR. GETCHELL:
4    Q.   Sir, you made reference in response to a question to there
5    being no shipments of cocaine that you know of since the
6    witnesses began cooperating in late 2019 or early 2021.  Did you
7    receive any information recently concerning another shipment
8    that was being prepared in the Dominican Republic for
9    importation into the United States?
10   A.   Yes.
11   Q.   What was the size of that shipment and who was involved?
12   A.   Several individuals out of the Dominican Republic, Danny
13   Nunez, Endy Nunez were conspiring to dispatch approximately
14   anywhere from 300 to 1,000 kilograms of cocaine.
15   Q.   And this information came to you from other sources of
16   information besides the cooperating defendants you referred to
17   earlier?
18   A.   Yes.
19   Q.   Now, regarding your testimony about the violence, I want to
20   make sure that I didn't make a mistake in my proffer and give
21   the court the wrong impression.  I said that an attempt was
22   discussed to assassinate a person by the name of Caballo that
23   was requested by a co-conspirator, and was going to be carried
24   out by Endy Nunez.  Did I get that wrong?  Because you said
25   there were no specific instances of violence.  I just wanted to
```

1      make sure that I had my proffer right.

2      A.   No, that specific instance where we received that

3      information was accurate, yes.

4      Q.   But having said that, there is no evidence that that

5      assassination was ever carried out; is that correct?

6      A.   It was not, no.

7      Q.   And finally, another place I want to correct my proffer, you

8      said that there were no businesses belonging to the Nunezes in

9      New York.  I represented the cooperator said that they had

10     businesses in New York.  Is that something the cooperators told

11     you that you have not been able to corroborate through

12     documentation?

13     A.   I have not been able to, no.

14     Q.   But the cooperators told you that?

15     A.   Yes.

16     Q.   All right.  And as far as the presence of counsel at the

17     airport, that was the government's idea.  We made that available

18     so that counsel would have a chance to meet with their clients

19     before they went into quarantine at FDC; is that right?

20     A.   Yes.

21          MR. GETCHELL:  Your Honor, I have nothing further.

22          Thank you, sir.

23          THE COURT:  All right.  All right.  Thank you very

24     much, Agent.  I guess you'll need to stand by for the second

25     defendant.

1          So the government, I think I already asked

2    Mr. Getchell, the government is asserting that there is a

3    presumption, and it is proceeding on risk and danger based on

4    the proffer that was made.  I don't know, Mr. Getchell, how much

5    more do you want to sort of maybe summarize what supports the

6    risk and the danger.  Maybe that would be a good way to go about

7    it, and then I'll hear from Mr. Quinon.

8          But we have been here since 10:00.  I think that it

9    would be prudent before we go into argument to just take a ten

10   minute break for those of us who have not been able to

11   disconnect.  So that's what I'm going to do for ten minutes,

12   just to catch our breath, and obviously if anyone does not need

13   to continue for these two cases, you are excused and whoever is

14   needed for these two cases, come back in 10 minutes.  And maybe,

15   Consuelo, do you need to switch with Giomar at this time?

16          SPANISH INTERPRETER:  Yes, Your Honor.  And I can just

17   be in the background just in case.

18          THE COURT:  Okay.  So maybe the marshal can get the

19   officer to come in and dial the new number while we take that

20   little break.  All right.  Ten minutes.

21          US MARSHAL:  Will do, Your Honor.

22          (Recess)

23          MR. GETCHELL:  No, just final argument.

24          THE COURT:  Yes, sir.

25          MR. GETCHELL:  Your Honor, as to risk of flight, I'll

1    summarize only briefly.

2         The defendants, this Defendant in particular, operates

3    businesses in the Dominican Republic where they have strong

4    ties, including family members, which may be for them, although

5    it may seem counterintuitive since they self-surrendered, but

6    may be a place that they could flee to if they decided this case

7    was too serious for them to face and didn't want to be in court.

8    Also, they're reputed to keep firearms at their place in the

9    Dominican Republic, so it might be for them an attractive place

10   to go to hide out if they did decide to flee.  Not only do they

11   own businesses there, but that also was the center of their

12   operations, including their relationship with the co-defendants

13   and where they held meetings with Miami-based co-conspirators

14   who traveled there and actually met with them in their family

15   home.

16        In addition, Your Honor asked about the amount of

17   cocaine.  There is a large amount of cocaine and substantial

18   penalties involved in this case could give rise to them deciding

19   to leave the jurisdiction of the court or the country, including

20   -- I tallied it up based on my proffer, at least 2,367 kilograms

21   of cocaine in cargo and approximately 1,850 kilograms of cocaine

22   smuggled aboard yachts based on the proffer, as well as two

23   seizures, one of 167 kilos at the port and a second seizure

24   which unfortunately I don't have the amount of right now, that

25   was a two-part seizure occurring in a van here in Miami and a

1    residence here in Miami following the seizure in the van.

2            As noted, the Defendants have strong family ties to the

3    Dominican Republic and also have a family member who is involved

4    in the conspiracy, a cousin who is in law enforcement, who is --

5    who we know is situated in a position where that person would be

6    able to provide information to the Defendants about their case

7    and the efforts of law enforcement to locate and apprehend them

8    which increases the dangerousness -- excuse me, the risk of

9    flight in our view having that asset.

10           In addition, Your Honor, I would just address it,

11   recognizing the fact that the Defendants surrendered, I would

12   argue that they surrendered in order to avoid arrest on our

13   arrest warrants in the Dominican Republic which could have led

14   to a lengthy period of incarceration there, especially in light

15   of the lengthy extradition process which can take upwards of a

16   year or even more.  And I'd submit that the Defendants would not

17   have wanted to remain in custody in the Dominican Republic,

18   whether for a short time or for a long time.

19           In terms of dangerousness, again Your Honor, it's the

20   shear quantity of drugs imported into this country over a period

21   of years.  It's the reputation of violence according to multiple

22   witnesses who have been interviewed by the DEA.  It's their

23   reputation for keeping firearms in the Dominican Republic,

24   although no specific information about firearms here in the

25   United States.  Nevertheless, they're known to keep firearms and

```
1    also, the specific involvement of Endy Nunez and this effort to

2    locate and assassinate another drug trafficker at the request of

3    a co-conspirator.

4              All these factors, Your Honor, I think met the

5    government's burden of showing that the Defendants are a risk of

6    flight and danger to the community.

7              THE COURT:  All right.  And you did say there was a

8    presumption here, correct?

9              MR. GETCHELL:  That's correct, Your Honor.

10             THE COURT:  All right.  Okay.

11             Let me hear from Mr. Quinon then.

12             MR. QUINON:  Yes, Your Honor.  Your Honor, just before

13   I start on the issue of the facts that I'm going to cover now,

14   they say rebuttable presumption, obviously so that can be

15   rebutted, and I'll get to it in a minute why we have done so.

16             In any event, I think it's important for the court to

17   understand that how these two Defendants, how my client comes to

18   be before the court.  I got a call to represent the Nunez

19   brothers initially, I didn't know what the nature of the

20   representation would be.  Eventually I made the contacts and

21   made the call to the Dominican Republic, and I found out that

22   these two individuals recently found out themselves that an

23   indictment had been returned against them, and they were

24   soliciting the services of an attorney in order to surrender

25   here in the United States.
```

```
 1            I've been involved in this as a lawyer now over 40
 2    years and this is mostly -- this is my job really, criminal law,
 3    particularly in the federal system, and I haven't had too many
 4    occasions where people who are in other countries want to come
 5    in and surrender, particularly with charges as serious as this.
 6    Now originally I didn't know how serious it would be.  I spoke
 7    to them and I wanted to make sure that this was a legitimate
 8    effort to surrender.  I didn't want clients, potential clients,
 9    to use me to get information about potentially a pending case.
10    So I made sure, I said listen, if you hire me, it's got to be --
11    you got to be sure you're going to surrender, and that assurance
12    was given.
13            I then called Assistant US Attorney Richard Getchell,
14    who Mr. Getchell and I have known each other for a long time
15    from another case that we had, a long time, and we know each
16    other, and I called Mr. Getchell and I wanted to know a little
17    bit about the case and how serious it was, and to let him know
18    that I had gotten a feeler to surrender from people that he
19    would be interested in having coming in.  So Mr. Getchell told
20    me, you know, that it was a drug case and immediately, I have
21    enough experience to ask the right question which is okay,
22    what's the weight involved, because the weight is important in
23    this type of case.  Mr. Getchell told me look, Jose, this is
24    more than 450 kilograms.  So I knew all about the level 38, I
25    discussed it with Mr. Getchell.  I said fine, let me go back and
```

1    talk to them and I'll circle back to you, Mr. Getchell.

2              And I did that.  I called the Dominican Republic, I

3    made sure that the individuals, before they surrender, they knew

4    what kind of case they were coming into, how serious it is, and

5    what the potential consequences would be.  All of that was

6    discussed, and they were very much aware of that and they said

7    no, we are going to go in and surrender.  And so I thought that

8    was excellent.

9              And I advised to hire another lawyer because although

10   they're brothers, I didn't want to represent them both for fear

11   of a potential conflict.  That's how Mr. Quintero, who

12   represents the brother Danny, comes into the case.

13             Now, thereafter I engaged in clearly well over a dozen

14   phone calls with the supervising DEA Agent Cernuda (ph) and to

15   try to arrange a surrender.  I also had various multiple phone

16   calls with the US Marshals in the Dominican Republic to arrange

17   the surrender because the question is how are we going to get

18   them out of the country.  Is it going to be a DEA flight, are we

19   going to do a commercial, all those things came into question

20   because it was necessary to coordinate.  And we did eventually,

21   and eventually we agreed on a place that they would meet with

22   the agents.  The DEA agents would then escort them to the

23   airport in the Dominican Republic and put them in a commercial

24   flight.  We felt that was the best, and everybody agreed on that

25   and that's how it was done.  So last Thursday, May 27th, that

1   was done.  That's how they came into the country.

2          And very important in this whole process is that not

3   once when I spoke to Mr. Getchell or any of the agents, again,

4   no pre-conditions, Your Honor.  I didn't advance any requests

5   for any favors or any requests for agreement to bond or anything

6   of that sort.  I felt that if the Nunez brothers wanted to

7   indeed, in good faith, surrender, they should do so without any

8   of that peripheral activity, and they agreed to that and that's

9   how we did it.  There was no pre-condition.  So they

10  surrendered.

11         I want to thank the agents, Agent Mariabello, as well

12  as the other agents who were absolutely wonderful.  They allowed

13  us to talk to the clients at the airport before they came into

14  FDC, which we knew would be in quarantine for 14 days, and we

15  were able to do that and I was very grateful, and I am right now

16  and I want to thank them because that was excellent on their

17  part.  So that's how we did it.

18         The next day then, we had the initial appearance with

19  Magistrate Jonathan Goodman and for the first time, the issue of

20  bond came up at the initial appearance.  Quite frankly, I'll be

21  very honest, I was surprised that Richard Getchell asked for

22  pretrial detention.  I thought he would agree to a bond in that

23  these two individuals came in and surrendered.  In fact, I was

24  not the only person surprised in that courtroom.  Magistrate

25  Goodman asked Mr. Getchell as well, you mean you're going to ask

1    for pretrial detention even though they came into surrender, in

2    a kind of questioning tone, and Mr. Getchell said yes, at this

3    time I am.  But I was surprised because it's not often, this

4    doesn't happen to face this type of case.

5         Now insofar as my client, he's 42 years old.  He's

6    never been arrested in his whole life.  He's never been

7    convicted of anything.  This is his first brush with the

8    criminal justice system, Your Honor.

9         Now, Mr. Getchell made references to the fact that he

10   has ties to the Dominican Republic, which is true.  That's where

11   he was born.  But he has deep ties here to the United States,

12   Your Honor.  My client has been living in the United States

13   since he was very little, since he was an infant basically.

14   First in the New York area, and the last four years or so here

15   in South Florida in Miramar where he lives with his family.

16        Now, my client, Endy Nunez, is a permanent resident.

17   He's here legally.  He could have applied, quite frankly in

18   retrospect he should have applied, for citizenship a long time

19   ago because he would have been eligible and he's a permanent

20   resident.  But he's here legally and has been since he was a

21   little kid.  And again, lives with his common-law wife Wanda

22   Vargas with whom he's had a relationship for 13 years.  And he

23   has three children, they are one year old, a two-year-old, and

24   the oldest one is ten years old, Your Honor.

25        Now Mr. Nunez, Endy Nunez, my client, is not a man who

 1   is highly educated at all.  I mean, I know that if you take a

 2   look at the Pretrial Services Report, you know, he's just

 3   doesn't really have a lot of education and in fact, he doesn't

 4   know how to read, he doesn't know how to write, and he didn't

 5   remember at that time, probably his nerves, about the address in

 6   Miramar where he's lived for all these years with his wife and

 7   children.  And aside from the wife and children, the mother,

 8   Porfelia, lives there with them and they are quite a tight

 9   family.  Again, total firm roots in this community.  He's lived

10   here with his family, his children.  The little girl, the little

11   child who is ten years old goes to school, okay, so this is a

12   family that lives in this community.

13          Now, does he have ties to the Dominican Republic?  Yes,

14   he does.  He's had those for years.  Okay.  There is a couple of

15   businesses that he's had there, one is called Cameo, C-A, M as

16   Mary, E-O Lounge, which he's owned with his brother Danny for 11

17   years.  They also own the Nunez Brothers Car Rental business

18   which they've had for 12 years, Your Honor.  And it is true

19   that, you know, a lot their income, the income of Endy, my

20   client, derives from his businesses there.  He makes about

21   $80,000 a year.  And so yes, he does have ties there and he used

22   to go there three, four times a year.  But the last time that he

23   went was a longer stay because of the pandemic.  He went there

24   in 2019 and got caught in this pandemic, and we all know that

25   traveling was just not very doable because nobody wanted to get

1    in an airplane at that time with this pandemic.  Even today it's
2    a dangerous situation.
3            So he's lived there, he lived there a little bit longer
4    this time because of the issues with the pandemic.  But even
5    though he has ties there, this is where he lives in South
6    Florida with his wife and his kids and his mother, who lives
7    with him.
8            Now, insofar as travel documents, Judge, when he came
9    into Miami, obviously the agents took the passport that he had
10   and kept it, and that's fine.  And I don't have -- we don't have
11   an objection if the passport of the wife and the three children
12   are to be surrendered as part of the conditions of bail in this
13   case.
14           While we're on that subject, Pretrial Services made a
15   recommendation of a 10% bond with Nebbia co-signed by the wife,
16   Wanda Vargas, with the conditions that he and they would report
17   to Pretrial Services as directed, that he surrender the
18   passports of the wife and the three children as well until this
19   case is over, or until an order of the court to that effect is
20   entered.  That Wanda, who is going to be a signatory as a
21   co-signer would not agree not to sell, pledge, hypothecate or
22   encumber any property that they own, whether personal or real,
23   until the bond is discharged or otherwise modified by the court,
24   and that Endy would not visit any transportation establishments
25   such as airport, marinas, seaports, commercial bus terminals,

1    train stations, et cetera.  Now that's Pretrial Services.

2         I would like to add that I would offer additional

3    conditions, and I would go one step further and agree that as

4    part of the condition of bail, electronic monitoring in this

5    case could be had, could be placed as an additional condition.

6    Okay.  So that Endy Nunez would be at home under monitor, under

7    electronic monitoring and could only come out to visit me, his

8    lawyer, which he needs to in order to prepare his defense, see a

9    doctor or worship.  And those would be the only times that he

10   would be let out of the house.  That would be an additional

11   condition that we offer to the court as well, Your Honor.

12        And we think that with those conditions, the issues

13   here of risk of flight and danger to the community are

14   addressed.  And the reason I say that is because first of all,

15   let me address the matter of risk of flight.  That is a very

16   hallow argument by Mr. Getchell, because it's hard to argue that

17   an individual is a risk of flight when he went to the trouble of

18   hiring a lawyer here to arrange his surrender, and came in and

19   surrendered without any pre-conditions knowing, knowing that

20   that lawyer had told him what the consequences could be in this

21   type of a case.  And he knew about all the supposed shipments

22   which, by the way, most of those are historical in nature.  From

23   what I understand, from what -- if I understood Mr. Getchell

24   correctly, only two seizures were made, the rest are really

25   historical in nature.  The word of basically individuals who had

1  been convicted or are offering cooperation in exchange for

2  benefits that they hope to receive or have received.  And so the

3  issue of risk of flight really is not an issue, Judge, because

4  they came in, they don't want to go back to the Dominican

5  Republic.  If they wanted to stay there, they would have stayed

6  there.  They wanted to come in, and they have done that.

7          And Mr. Getchell said that it's a risk of flight

8  because suddenly, if they feel it's too much of a case, they can

9  go back to the Dominican Republic.  But at the same time,

10 Mr. Getchell said that part of the reason why they surrendered

11 was to avoid an arrest warrant in the Dominican Republic and to

12 go to jail in the Dominican Republic.  So why would they go back

13 to the Dominican Republic to risk going to jail in the Dominican

14 Republic if that's what they wanted to avoid, according to

15 Mr. Getchell.  So Mr. Getchell is going both ways, contradicting

16 himself in some ways, inconsistent I should say, but the bottom

17 line is look, they came in, they surrendered, they knew the

18 seriousness of the matter, so a hallow argument.  Risk of flight

19 really is not there.

20          Now that brings us to the second issue which is danger

21 to the community, where the burden of proof is higher now for

22 the government, clear and convincing evidence.  Again, here they

23 advance the amount of drugs basically, and this issue of

24 reputation for violence.  But again, no substance to that.

25 There is no specific area that they can say he did this, that is

1    a violent act, or somebody saw him with firearms that

2    Mr. Getchell mentioned that they had supposedly in Dominican

3    Republic.  Nobody has said that.  About as close as we get to

4    any type of violence is that somebody supposedly says -- can you

5    hear?

6         IT TECHNICIAN:  It looks like we have another

7    connection open.  And they're gone.

8         MR. QUINON:  Okay.  As close as they get to anything of

9    violence is supposedly somebody said hey, Endy was supposed to

10   do something to somebody, kill somebody in the Dominican

11   Republic, which of course I didn't even ask questions about it

12   because it's obvious, the person, that never happened.

13        SPANISH INTERPRETER:  One moment from the interpreter,

14   Mr. Quinon.

15        MR. QUINON:  Sure.

16        SPANISH INTERPRETER:  Okay. We're fine.

17        MR. QUINON:  Okay.  Thank you.  So in any event, Judge,

18   this is another one of those situations that there is no

19   substance here.  When violence is sufficient to detain, normally

20   you have some evidence that the individual has engaged in

21   violent acts.  We don't have that here.  And the burden of proof

22   on the government is, again, clear and convincing evidence,

23   which is higher and is not here.

24        Now, contrast it or weighed against what I have

25   presented in the case which is individuals, Endy who lives here,

1    has family here, the wife, the mother, his kids who go to school

2    here, no acts of violence, no prior arrests, no prior

3    conviction, and on top of that, came into surrender.  I submit

4    to you that if you give him a bond, has electronic monitoring, a

5    10% bond co-signed by the wife in this case, with the

6    restrictions mentioned by Pretrial Services, that is more than

7    sufficient in this case, Your Honor.  Everything has indicated a

8    willingness to face the charges, and they're here for that

9    purpose.

10           So that's all that I have to say, Judge, at this point.

11           THE COURT:  All right.  Anything else from the

12   government?

13           MR. GETCHELL:  Well, only a couple things.  First, the

14   Mr. Quinon was negotiating with the DEA group supervisor as to

15   the place and time of the Defendant's surrender.  This is the

16   first DEA -- I have heard him negotiating with US Marshals

17   Service.  I'm interested in knowing who with the US Marshals

18   service Mr. Quinon spoke about, and what, if any, conditions of

19   surrender were discussed and what those terms were.

20           MR. QUINON:  Sure.  Supervising Agent Cernuda from the

21   DEA asked me to speak directly to Sasha -- the name will come to

22   me, I have it in my notes here.  Sasha, if you'll give me a

23   second, I'll give you her name.  And I spoke to her various

24   times about the surrender, Mr. Getchell.  Sasha Zacharias,

25   Z-A-C-H-A-R-I-A-S.  I can give you her phone number.  She has

1    two phone numbers.

2              MR. GETCHELL:  Don't give the phone number on this call

3    please.

4              MR. QUINON:  Okay.  I can testify to you --

5              MR. GETCHELL:  Thank you.

6              MR. QUINON:  Multiple times I spoke to her, and

7    actually I ended up coordinating with her at the very end

8    because she was the one who was going to be boots on the ground.

9    She's the one who actually met the two clients near the airport,

10   walked them into the airport, and then walked them into the

11   airplane and made sure they were seated in the airplane.  I mean

12   she was wonderful, quite frankly.  Very professional, as

13   professional, again, as the DEA agents, they were absolutely

14   stellar, super wonderful, and everything was very smooth because

15   we had a very good line of communication and understanding among

16   everybody.

17             MR. GETCHELL:  All right.  Thank you.

18             Your Honor, in terms of the risk of flight and danger

19   to the community, I think I've presented my evidence and made my

20   argument to support my burden.

21             Just in rebuttal, I would say the Defendants could

22   return to the Dominican Republic, or for that matter go anywhere

23   they want in the country or in the world rather than here, and

24   that they understand the nature of the charges.  The case was

25   highly publicized prior to the time they contacted Mr. Quinon

1    and surrendered.  The case was highly publicized in the

2    Dominican Republic due to the arrest of the codefendant Miguel

3    Andres Gutierrez, who is a member of Congress in the Dominican

4    Republic, and I'm sure that the Nunez brothers saw that and

5    wanted to make sure they weren't a target of a manhunt in the

6    Dominican Republic and so contacted my office, in an effort to

7    mitigate those risks, and turn themselves in.  We weren't aware

8    of where they were located until they showed up to the airport

9    to be with the marshals and get on the airplane.

10            As far as danger goes, Your Honor, again, it was the

11   amount that was trafficked over time and the prolific nature of

12   these Defendants' drug-trafficking activities, as well as the

13   pending 300 kilogram load that was in the works in the Dominican

14   Republic at the time that this case broke and they elected to

15   turn themselves in.  So I don't think the danger to the public

16   has been mitigated in any way by the surrender and proffered

17   information Mr. Quinon has presented and securities for the bond

18   that he's recommended.  So we believe we've met our burden, Your

19   Honor, and rest on that record.

20            MR. QUINON:  Your Honor, one last thing before --

21            THE COURT:  Yes.

22            MR. QUINON:  -- you rule on this matter.  Again, when

23   they heard about they were wanted, that's when we scrambled to

24   hire a lawyer to surrender and that's how I came into the

25   picture.  Also, as you can see from the screen that that's the

1    Nunez family there, they are on the feed to this hearing, in the
2    Zoom feed, the Nunez house is labeled there and that's the
3    family.  I mean, it's a very united family that is there for
4    purposes of the bond hearing.  Thank you.
5         THE COURT:  All right.  All right.  So the government
6    is traveling on both risk of flight and danger to the community.
7    There is a presumption.  I believe with respect to the risk, the
8    presumption has been overcome by the ties that the Defendant has
9    in terms of this community having a wife and children here.  And
10   although the burden for risk of flight is lesser, only
11   preponderance of the evidence, the fact that the Defendant
12   surrendered also militates against that finding.
13        I do find by clear and convincing evidence that the
14   Defendant presents a danger to the community based on the
15   extraordinary amount of drugs that have been charged, and the
16   length or period of those shipments into this community and then
17   further into New York.  I believe that this importation of
18   cocaine that the Defendant is charged with being part of does
19   definitely, as we know day in and day out, the issues of drugs
20   in our community, does present a danger to the community.  So I
21   make the finding that as to the danger, he has not overcome the
22   presumption and further, by clear and convincing evidence, that
23   he does present a danger to the community based on the amount
24   and the length of the time of the shipments involved in the
25   charges.

1        So I believe that at this time we are ready for the

2   second defendant.  I note that I have afternoon calendar at

3   2:00.  We did take a ten-minute break.  We do -- because the

4   other defendant was not present, we'll need to go through the

5   proffer that was made by Mr. Getchell and we need to allow

6   Mr. Quintero to ask questions.  I would ask Mr. Quintero,

7   because he was present and listening, not to duplicate the

8   questions that were asked by Mr. Quinon so that we can move with

9   a little bit more alacrity and try to finish this in time to

10  have a break before the 2:00, if that's possible.  But I will

11  not curtail your time, Mr. Quintero.  You do as you need with

12  due regard for the time constraints that we're in.  But I don't

13  want to shortchange you in any way just for having come in

14  second.

15        DEFENSE 2:  Thank you, Judge.

16        THE COURT:  All right.  So let's see if we can ask the

17  interpreter to ask Mr. Nunez to tell the officer that we are

18  done with him, and could they bring Mr. Danny Nunez Marmol.

19        (PROCEEDINGS CONCLUDED)

                              *  *  *  *  *

20
                        C E R T I F I C A T E
21  I certify that the foregoing is a correct transcript from the
    digital audio recording of proceedings in the above-entitled
22  matter.

23
    6/21/2021_____          /s/ Dawn M. Savino, R.P.R., C.R.R.
24  Date                      DAWN M. SAVINO, R.P.R., C.R.R.

25

26

1

2                          **I N D E X**

3                            **WITNESSES**

4      ALL WITNESSES:                                    PAGE:

5      For Government:

6        Marcelino Mariabello:
           Cross-Examination by Mr. Quinon              14:15
7          Redirect Examination by Mr. Getchell         27:2

8                            **EXHIBITS**

9      None

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25